The SQUAW TRANSIT COMPANY,
Petitioner,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

J. H. Rose Truck Line, Inc., Intervenor.

No. 76–1929.

United States Court of Appeals,
Tenth Circuit.

April 11, 1978.

Lloyd Scurlock, Fort Worth, Tex. (Clayte Binion, III, Fort Worth, Tex., with him on the brief), of Sayers, Scurlock, Binion & Brackett, Fort Worth, Tex., for petitioner.

Jeffrey A. Knoll, Atty., I. C. C., Washington, D. C. (Donald I. Baker, Asst. Atty. Gen., Lloyd John Osborn, Atty. Dept. of Justice, Mark L. Evans, Gen. Counsel, Peter A. Fitzpatrick, Asst. Gen. Counsel, Washington, D. C., with him on the brief), for respondent I. C. C.

James M. Doherty, of Doherty, Robertson & Birnbaum, Austin, Tex., for intervening respondent J. H. Rose Truck Line, Inc.

Before McWILLIAMS, DOYLE, and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

This appeal seeks to set aside an order by the Interstate Commerce Commission (hereafter referred to as ICC or Commission) which partially denied a "gateway"[1] elimination application filed by Petitioner, Squaw Transit Company (hereafter referred to as Squaw).

Two issues are raised by petitioner Squaw. It challenges the Commission's holding that Squaw did not demonstrate that it had substantial traffic and was an effective competitor between certain of the points served through its gateways. Squaw also asserts that the ICC erred in ignoring or misapplying "grandfather" procedures it bound itself to follow in gateway elimination cases.

A brief review of the background of the relevant regulations and of the instant situation will aid an understanding of our resolution of the issues raised. The practice of tacking operating authorities through gateways, which the ICC tolerated for years, allowed trucker carriers to serve many areas by highly circuitous routings. With the

---

1. A gateway results from the procedure known as "tacking," by which motor carriers combine or "tack" separate and unrestricted grants of operating authority at a common point, called the gateway. This procedure allows carriers to conduct operations from points served under one authorization to those served in the other through the gateway.

advent of the fuel crisis in 1973, the ICC became concerned about these practices as wasteful of fuel. The result was a major rule-making proceeding and adoption of regulations designed to curtail gateway operations by irregular route carriers. *See* 49 C.F.R. § 1065.1. The regulations provide, as pertinent, that when the circuity involved in a gateway movement exceeds 20% of the most direct highway distance between the two points, a gateway elimination application to operate directly between the two points must be filed by the carrier. As a result the carrier either will be permitted to carry its goods by direct routes without being required to use its old gateways, or will be prohibited from hauling at all between the points. *Inter alia*, the carrier is required to show its operations via the gateway for the two years preceding November 23, 1973. 49 C.F.R. § 1065.-1(d)(2)(iii). The regulations by reference to the processing procedures of Gateway Elimination, 119 M.C.C. 530 (1974) commit the ICC to evaluation of the application under the traditional criteria of *Childress—Elimination Sanford Gateway*, 61 M.C.C. 421, 428 (1952). Under *Childress* a carrier is required to show two things to eliminate a gateway: (1) that it is actually transporting a substantial volume of traffic between the points, and in so operating is effectively and efficiently competing with the existing carriers, and (2) that the elimination of the gateway requirement will not enable it to institute a new service or one so different from that which it has been providing as to materially improve its competitive position to the detriment of existing carriers. The gateway elimination regulations have been upheld as a valid exercise of the rule-making power of the ICC. *Thompson Van Lines, Inc. v. United States*, 399 F.Supp. 1131 (D.D.C.1975), *aff'd mem.*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976).

Squaw is an irregular route common carrier for the transportation of oil field and earth drilling machinery, equipment, materials and supplies. As required by the regulations, it filed an application seeking to eliminate certain gateways, thereby allowing direct service between the points. As is here pertinent, Squaw was authorized to transport oil field items between points in Michigan, Illinois, Indiana and Ohio on the one hand, and, on the other, points in Arkansas, Louisiana, Mississippi, Alabama, Georgia and Florida. The gateways to be eliminated were in Oklahoma, Arkansas and Texas.

In support of its application, Squaw submitted a traffic abstract documenting about 250 shipments, but only 76 were within the two-year period prescribed by 49 C.F.R. § 1065.1(d)(2)(iii), and five of those did not pass through any gateway. Of the 71 shipments then remaining for consideration by the ICC, 49 were from Ohio to Louisiana. This portion of Squaw's application was granted and is not in issue on this appeal. The other shipments over the two-year period are the support for petitioner's appeal.

The only protestant to file a verified statement in opposition to Squaw's application was J. H. Rose Truck Lines, Inc. It exhibited authorities substantially like that of Squaw, but presented no evidence of the number of shipments it carried between the points involved in Squaw's application. The nearest it came was a showing that it had a terminal in Illinois, several in Louisiana, a significant volume of business overall, but only a statement by its executive vice president that, "Traffic of the kind involved in this application and traveling within the scope of this application accounts for an important portion of Rose's business."

As mentioned above, Squaw's application for direct service between points in Ohio to points in Louisiana was granted by ICC Review Board No. 1. The remainder of the application was denied. The order found that only with respect to shipments from points in Ohio to points in Louisiana did Squaw demonstrate "that it has transported substantial traffic through its gateways, and is an existing effective competitor for this traffic," in compliance with the evidentiary requirements of *Childress, supra.* Three shippers had given statements in support of Squaw's application, but it was ruled that they did not establish a public

need for the proposed through service. The statements were considered deficient to establish a public need in various respects, including failure to identify the volume of freight to be shipped, origins and destinations of shipments expected to be made through Squaw, and the inadequacy of other services available to handle the shipments.

ICC Division 1, acting as an appellate division, denied Squaw's petition for reconsideration, with one Commissioner dissenting. The dissenter stressed that Squaw was a small specialized carrier of oil field equipment, with traffic of a sporadic nature and an experience of shifting traffic patterns. He stressed that Squaw had demonstrated that it shipped some traffic between most of the points at issue, while the only protestant had submitted no evidence of any traffic by it between these points. Squaw's contentions on appeal are along the same lines, that protestant's failure to show that it had any shipments to or from the points in question is conclusive evidence under the *Childress* standard that Squaw's traffic was substantial and that it was an effective competitor, thus requiring a holding by the ICC that Squaw be allowed to provide direct service between the locations in issue. It also argues this is bolstered by the Commission's own commitment to apply "grandfather" type rules.

We are cognizant of the limited scope of the review of agency decisions by this Court under the Administrative Procedure Act. We are not to set aside or modify the ICC order if it has a rational basis supported by the record and is not arbitrary or capricious. 5 U.S.C. § 706; *Squaw Transit Co. v. United States*, 402 F.Supp. 1278 (N.D.Okl.1975) (a three-judge case treating another aspect of this same litigation).

We first treat the "grandfather" issue. 49 C.F.R. § 1065.1(d)(2)(iv) refers to Gateway Elimination, 119 M.C.C. 530 (1974) for its procedures in processing these applications. That case states:

In deciding such an application we will apply the criteria enunciated in the *Childress* case, *supra*, as amplified in other Commission precedent decisions. *This will not, as many parties fear, impose a greater burden of proof than that governing regular elimination-of-gateway applications, but will be somewhat more akin to the standard "grandfather" procedures utilized by this Commission in the past.* The principal difference between such a gateway-elimination application and the usual one will be that the former will be assigned priority and be determined as expeditiously as possible given the severe strains now upon our staff and budgetary resources. *Because we do not otherwise intend to alter the burden of proof in these applications or materially change the existing competitive situation, protests will be permitted in any application proceeding filed under this regulation.* [Emphasis supplied.] 119 M.C.C. 550.

Squaw argues that the reference to grandfather procedures ties the ICC to the same standard as the original grandfather clause in 49 U.S.C. § 306(a) where Certificates of Public Convenience and Necessity were issued without proof beyond a showing that applicant was in bona fide operation over the routes with respect to which petition was made at the time the act becomes effective. We do not agree. The same paragraph which mentions the grandfather provisions refers expressly to the fact that protests will be permitted and the burden of proof is not altered.

The Fifth Circuit has recently discussed the relationship between the grandfather proviso and the burden of proof in a gateway elimination case. By an analysis with which we agree, *Refrigerated Transport Co., Inc. v. Interstate Commerce Commission*, 552 F.2d 1162 (5th Cir. 1977), concluded that the grandfather proviso did not mandate that those carriers using gateways could continue to do so or be allowed to provide direct service. The provisions were designed to eliminate circuitous routes which wasted fuel, and normal grandfather considerations for continuing past practices are antithetical to the purpose of the rules. There was no error here in the refusal to follow grandfather procedures.

Turning to the other issue, it seems apparent that the ICC, in this case, did not rely upon a comparative approach whereby it measured the traffic by Squaw as compared to that of intervening respondents or other carriers serving the same states. The record contains no data as to traffic actually handled by intervenor nor any other shipper between the points at issue. The opinion makes no attempt at comparative analysis of any kind.

The Commission order states simply that except from Ohio to Louisiana Squaw is not transporting "substantial traffic through its gateways," and is not an effective competitor. Relevant is Squaw's own admission of only 23 shipments in the two-year period between the states as follows:

9 from Ohio to Arkansas

2 from Ohio to Alabama

1 from Ohio to Mississippi

2 from Arkansas to Ohio

2 from Arkansas to Michigan

2 from Indiana to Louisiana

1 from Indiana to Mississippi

1 from Louisiana to Michigan

1 from Louisiana to Ohio

1 from Alabama to Michigan

1 from Michigan to Louisiana

all together producing only $21,096.24 in revenue. (Petitioner's brief, pp. 3–4). No shipments were shown to Florida and Georgia, for which authority was sought.

If the ICC is permitted to look at numbers of trips and apply a de minimus rule, without reference to what others carry, as the words "substantial traffic" imply, then there would seem to be little room for argument in this case. We presume that under its rule-making authority it could adopt such a rule, holding that two or fewer trips in a 24-month period, or even 9, are not substantial traffic to justify granting a gateway elimination application. Such a rule could save the cost of protest by some intervenor respondents, and reduce the workload of the Commission. This appears to be the basis for the affirmance in *C. A. White Trucking Co. v. United States,* 555 F.2d 1260 (5th Cir. 1977) of an ICC gateway elimination order where there were four or fewer trips between points at issue.

Our view, however, is the same as we perceive to be that of the Court in *Chem-Haulers, Inc. v. Interstate Commerce Commission,* 565 F.2d 728 (D.C.Cir.1977). *See also Blodgett Uncrated Furniture Service, Inc. v. United States,* 288 F.Supp. 591 (W.D. Mich.1968). We are greatly concerned with the inconsistency of the Commission. In *Chem-Haulers* and other cases cited to us which we have examined, when considering small carriers, or those with few hauls between points at issue, sometimes the ICC appears to use a de minimus and in others a comparative approach where the volume of petitioner versus that of intervening carriers is the all important factor. For example, in *Overnite Transportation Company Elimination of Gateway—Monroe,* N.C., 103 M.C.C. 135, 148 (1966) the Commission stated:

Clearly, since the primary interest to be protected in an elimination-of-gateway case is that of any protestants already in the considered traffic market, the measure of the substantiality of applicant's penetration of that market is largely taken as its traffic volume therein as compared to protestants' traffic volume, with some adjustments to reflect the relative differences in size of the carriers. . .

In other cases where there were as few as one trip between points the gateway elimination was permitted, upon a similar analysis. *See, e. g., Anchor Van Lines Inc., Extension-Elimination St. Mary's County Gateway,* 77 M.C.C. 101 (1958); *Atlas Van Lines, Inc., Extension-Elimination of Four Gateways,* 105 M.C.C. 156 (1967).

In the case before us, decided by the appellate division of the Commission September 21, 1976, it seems clear the ICC applied some absolute de minimus rule. We have searched the record and the orders in vain for comparisons of the traffic of Squaw versus that of intervening respondent or others, or for an explanation of the basis of the decision other than that there were only a very few trips made by peti-

tioner. Yet in a case decided April 22, 1977, *Goendyke Transport, Inc., Extension-Gateway Elimination,* 126 M.C.C. 571, the commission expressly rejects the de minimus approach and adopts the comparative approach in gateway cases. The case states:

A threshold question in any gateway elimination proceeding, then, is whether the applicant has transported a substantial amount of traffic through the pertinent gateway. To grant authority from and to points to which an applicant has not actually transported traffic would result in a windfall grant of authority neither contemplated by the gateway rules, nor required by the public convenience and necessity. *There is no mechanical test to determine substantiality. Rather, the number of shipments which would constitute substantial participation in the traffic involved is a relative one,* and an applicant's participation must be evaluated in light of the circumstances attendant each particular case. *Among the factors to be considered in this determination are* the nature of the authority held, the nature of the commodities transported, the breadth and character of the points or territories served, *volumes transported by applicant in comparison to those transported by protestants,* the relative size of applicant and protestants, and other factors related to maintaining the competitive balance. *See, e. g., Anchor Van Lines, Inc., Ext.—Elimination of Gateway,* 77 M.C.C. 101 (1958), *Overnite Transp. Co. Elimination of Gateway,* 103 M.C.C. 135 (1966); *Blodgett Uncrated Furniture Service, Ext.—Gateways,* 108 M.C.C. 365 (1969); and *Atlas Van Lines, Inc., Ext.—Elimination of Gateways,* 105 M.C.C. 156 (1967).

. . .

Finally, while reference is made in the Appellate Division's order to a so-called 24-shipment standard as the test for the quantum of traffic which would be considered as substantial, our analysis of the record in this proceeding indicates clearly that no such mechanical test was applied by the review board. Despite the Appellate Division's statement that the Com-

mission had consistently provided that type of standard, *examination of Commission records reveals that numerous grants of authority have been approved upon a showing of fewer than 24 shipments during the 2-year base period.* See for example, applicant's own proceeding in No. MC–111401 (Sub-No. 428G). *A mechanical rule such as 24 shipments in a 2-year period would not constitute an appropriate test of substantiality as that term is used in Childress—Elimination Sanford Gateway, supra, at 428. Any decisions to the contrary are erroneous and are hereby expressly overruled.* [Emphasis supplied.]

126 M.C.C. at 574–575, 576–577.

We cannot find the analysis mentioned above in the instant case. We cannot square this decision of the Commission with its own standards as announced in *Goendyke.*

While the Commission would have the power to adopt either of two different approaches to deciding these cases, it cannot adopt one and apply the other. To do so is the essence of arbitrary and capricious action. While as a reviewing court we are not to interfere with discretionary functions of a governmental agency, we surely must require the agency to adhere to its own pronouncements, or explain its departure from them. The Commission's opinion in this case does not apply the criteria it has announced as controlling.

Therefore case is REVERSED AND REMANDED for proceedings consistent with this opinion.